**TA LEGAL GROUP PLLC**
Taimur Alamgir, Esq.
Matthew J. Daidola, Esq.
205 E Main Street, STE 3-2
Huntington, NY 11743
(914) 552-2669
(631) 942-7399
tim@talegalgroup.com
matthew@talegalgroup.com
*Attorneys for Plaintiff Paris, FLSA Collective Plaintiffs, and Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GASTRIDE PARIS, *on behalf of herself, FLSA Collective Plaintiffs, and Class Members,*

Plaintiff,

- against -

JEWISH CHILD CARE ASSOCIATION OF NEW YORK, INC. & DAVID SPOKOWSKI

Defendants.

**Case No.:**

**COLLECTIVE AND CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

Plaintiff, **GASTRIDE PARIS** ("Plaintiff" or "Paris"), on behalf of herself, the FLSA Collective Plaintiffs, and Rule 23 Class Members, by and through her undersigned counsel, TA Legal Group PLLC, hereby files this Class and Collective Action Complaint against Defendant **JEWISH CHILD CARE ASSOCIATION OF NEW YORK, INC.** ("JCCA") and **DAVID SPOKOWSKI** ("Spokowski"), collectively as ("Defendants"), and alleges as follows:

## INTRODUCTION

1. Plaintiff Gastride Paris, a former employee of Defendant, brings this action to redress a pattern of wage and hour violations, disability discrimination, retaliation, and negligence.

2. As a dedicated Family Support Specialist ("FSS") Paris sustained severe, permanent injuries to her left ankle and foot due to Defendant's gross negligence in failing to secure a known dangerous environment. Following this traumatic workplace injury, rather than supporting Plaintiff's recovery, Defendant engaged in a pattern of bad faith maneuvering, failure to engage in the interactive process required by law, retaliation, and unlawful termination.

3. Defendant sought to force Plaintiff into a different position as a Case Planner ("CP") that contravened her medical restrictions regarding driving and standing, refused to memorialize accommodations in writing, and attempted to pay her at a lower rate for a higher-level position.

4. Defendants' conduct characterized by shifting offers, threats of termination, and a refusal to provide reasonable written accommodations constituted a constructive discharge and unlawful discrimination based on disability.

5. Furthermore, Plaintiff asserts wage and hour violations under the Fair Labor Standards Act ("FLSA") on behalf of a statewide collective, and under the New York Labor Law ("NYLL") on behalf of a Rule 23 Class. Defendant engaged in a systemic "time-shaving" scheme, requiring Plaintiff and similarly situated FSSs and CPs to routinely work through scheduled, unpaid meal breaks and rest periods without compensation.

## CLAIMS

6. Plaintiff seeks recovery under the FSLA on behalf of herself and FLSA Collective Plaintiffs from Defendants of the following: (1) unpaid overtime, 2) liquidated damages, and (3) attorney's fees and costs.

7. Plaintiff further alleges, pursuant to the anti-retaliation provisions of the FLSA and NYLL that she is entitled to damages, including back wages, front wages, emotional distress damages, punitive damages, liquidated damages, pre-judgment interest of 9%, and attorneys' fees and costs, based on retaliation, culminating in Plaintiff's unlawful termination.

8. Plaintiff further alleges, pursuant to Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq* and the Rehabilitation Act, Section 504, 29 U.S.C. § 794, Defendants discriminated against her based on her disability, subjected her to a hostile work environment, and that she is entitled to damages including, back pay, front pay, compensatory damages, emotional distress, punitive damages, and reasonable attorneys' fees and costs.

9. Plaintiff further alleges, pursuant to the New York State Human Rights Law ("NYSHRL"), Defendants discriminated against her based on her disability and subjected her to a hostile work environment, and subjected her to retaliation, and that she is entitled to damages including, back pay, front pay, compensatory damages, emotional distress, punitive damages, and reasonable attorneys' fees and costs.

10. Plaintiff further alleges, Defendants engaged in gross negligence and in violation of OSH Act (29 U.S.C. § 654(a)(1), Section 5(a)(1) and NYLL § 200 and failed to furnish a workplace free from recognized hazards. Plaintiff is therefore entitled to damages including, compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

11. Plaintiff further alleges, pursuant to New York Not-for-Profit Corporation Law (N-PCL) § 715-b, that she made Whistleblower complaints against Defendants and that

Defendants retaliated against Plaintiff because of her complaints. Therefore, she is entitled to back pay, front pay, compensatory damages, and reasonable attorney's fees and costs.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1337 because Plaintiff's claims under the FLSA and 42 U.S.C. § 12112(a) raise a federal question..

13. This Court possesses jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

14. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims in this District.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

15. Plaintiff brings claims for relief as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of all FSS and CP workers and similarly situated workers at all JCCA statewide facilities including but not limited to the following locations 57 Willoughby Street, 6th Fl, Brooklyn, NY 11201, 425 Westchester Ave, Bronx, NY 10455, and 1075 Broadway, Pleasantville NY 10570, on or after the date that is three (3) years before the filing of the Complaint in this action ("FLSA Collective Plaintiffs").

16. At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and utilizing a time shaving scheme in order to defraud employees of proper overtime compensation as required by law. The grievances articulated by Plaintiff herein mirror those affecting all FLSA Collective Plaintiffs.

17. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA

Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

**RULE 23 CLASS ACTION ALLEGATIONS**

18. Plaintiff seeks relief under Federal Rule of Civil Procedure 23 on behalf of a class consisting of on behalf of all FSS's, CP's, and other non-managerial, hourly employees employed at JCCA including by not limited to the following locations 57 Willoughby Street, 6th Fl, Brooklyn, NY 11201, 425 Westchester Ave, Bronx, NY 10455, and 1075 Broadway, Pleasantville NY 10570 on or after the date that is employed by Defendants on or after the date that is six (6) years before the filing of the Complaint in this action (hereafter "Class" or "Class Members").

19. Throughout the relevant periods, Plaintiff and Class Members have been similarly situated, sharing substantially similar job requirements, pay provisions, and subjected to Defendants' uniform decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules. This unified treatment resulted in widespread failures, in contravention of the NYLL, to pay Plaintiff and Class Members:

a. Regular wages;
b. Overtime wages;
c. Liquidated damages with respect to unpaid wages;
d. Liquidated damages for unlawfully delayed payments under NYLL § 191.
e. Failure to provide required wage notices and statements in compliance with NYLL § 195.1 and § 195.3, respectively.

20. The claims of Plaintiff stated herein are essentially the same as those of Class Members.

21. Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

22. The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants there is no doubt that there are more than forty (40) members of the Class. There are similarly more than forty (40) members of the subclass.

23. Defendants' enterprise-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

24. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff-Paris and Class Member Plaintiffs are represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

25. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation

where individual class members lack the financial resources to vigorously prosecute a lawsuit against a corporate defendant. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

26. Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs.

27. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

28. There are questions of law and fact common to the Class which predominate, including:

a. What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly.

b. At what common rate, or rates subject to common methods of calculation, were and are Defendants required to pay Plaintiff and Class Members for their work;

c. Whether Defendants failed to compensate Plaintiff and Class Members for all hours worked.

d. Whether Defendants failed to pay Plaintiff and Class Members overtime pay for hours worked in excess of 40 each week.

e. Whether Defendants unlawfully failed to provide Plaintiff and Class Members wage notices in compliance with NYLL § 195.1.

f. Whether Defendants unlawfully failed to provide Plaintiff and Class Members wage statements in compliance with NYLL §195.3.

## PARTIES

### Plaintiff

29. **GASTRIDE PARIS** is a resident of Dutchess County, New York. She has over 10-years experience in education and social services.

30. In Spring 2022, she was hired as a Family Support Specialist for Defendant JCCA in their Pleasantville location.

31. On January 24, 2025, a client of JCCA assaulted her, injuring her right ankle. This led to Paris going on Workman's Compensation Disability.

32. On January 8, 2026, JCCA unlawfully terminated Paris.

### Defendants

33. **DEFENDANT - JCCA** is a domestic not-for-profit 501(c)(3) corporation with a principal place of business at 57 Willoughby St., Brooklyn, NY 11201. JCCA is an "employer" and an "enterprise engaged in commerce" within the meaning of the FLSA and NYLL.

34. JCCA has three locations: 57 Willoughby Street, 6th Fl, Brooklyn, NY 11201, 425 Westchester Ave, Bronx, NY 10455, and 1075 Broadway, Pleasantville NY 10570.

35. JCCA's primary services are foster care placement, residential treatment care for youth with severe emotional and behavioral challenges, mental health counseling, and prevention services.

36. **DEFENDANT - SPOKOWSKI** is Director of Employee Benefits. Spokowski unlawfully terminated Paris on January 8, 2026.

37. Defendants supervised Paris, FLSA Collective Plaintiffs, and Class Members and had control over the terms and conditions of Plaintiff's employment, and those of similarly situated employees. Trupia had authority to (i) fire and hire employees, (ii) determine rate and method of pay and compensation of employees, (iii) adjust employee work schedules, (iv) maintain employees' employment records, and (v) otherwise affect the quality of employment of Plaintiff and the FLSA Collective Plaintiffs.

**CONDITIONS PRECEDENT TO SUIT**

38. This Court has personal jurisdiction over the Defendants in that they are incorporated in the state of New York, maintain a corporate headquarters in the State of New York, are domiciled in the state of New York, and/or are subject to personal jurisdiction under NY CPLR § 302, New York's long arm statute.

39. Defendants engage in an enterprise whose annual volume of sales made or business done is not less than $500,000, the activities of which affect interstate commerce in that employees of Defendants handle and provide services and goods produced outside of New York that moved in interstate commerce and the Defendants, as employers of such a business, are subject to the jurisdiction of the FLSA.

40. At all relevant times, Defendants were and continue to be an "enterprise engaged in commerce" within the meaning of the FLSA, the NYLL, 42 U.S.C. § 12112(a), the NYSHRL and any other Regulations thereunder.

41. At all relevant times, the work performed by Plaintiff and FLSA Collective Plaintiffs was directly essential to the business operated by Defendants.

42. Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

## STATEMENT OF FACTS

**Paris, FLSA Collective Plaintiff and Class Members Suffered Unpaid Overtime and Regular Wages Due To Common Unlawful Policies**

43. Paris's employment duties consisted of providing and coordinating service plans, educating, and vocational services for clients suffering substance abuse and behavioral health issues. Paris performed her duties under the supervision of Defendants Spokowski and JCCA management members.

44. Paris's employment contract ("Contract") with Defendants stipulated she would work forty (40) hours a week. She was paid an annual rate of $53,000 a year with overtime work payable at a rate of one and one-half (1.5) times the base hourly rate.

45. Throughout her employment, Paris routinely was required by Defendants to arrive early and start work early prior to clocking in, and remain at work after clocking out in order to meet the excessive demands imposed by Defendants.

46. These requirements to perform unpaid off-the-clock work before and after shifts resulted in Paris and co-workers being deprived of regular and overtime compensation for approximately 3-4 hours per week during her employment.

47. Additionally, Defendants required Paris and co-workers to work through unpaid breaks each day without compensation. This included employee lunch breaks and personal breaks.

48. Due to this common practice of requiring employees to work during unpaid breaks, Paris was deprived of compensation for approximately 2 hours of regular and overtime work per week.

49. In total, due to the above-described time-shaving practices, Paris suffered approximately 5-6 unpaid hours of regular and overtime per week during her employment period.

50. Like Paris, FLSA Collective Plaintiffs and Class Members were deprived of compensation for unpaid work that Defendants required them to perform before and after shifts and during scheduled breaks.

51. As a FSS, Paris personally observed other FLSA Collective Plaintiffs and Class Members subjected to the same treatment and similarly deprived of earned wages.

52. Paris never received any proper wage notices or wage statements from Defendants, as required under NYLL 195.1 and NYLL 195.3, respectively. This failure further deprived her of the ability to adequately review, verify, or contest her compensation.

53. During her employment by Defendants, Plaintiff was at all times non-exempt from the overtime requirements of the FLSA or NYLL, and not within the exemption for commissioned employees or any other exemption. Likewise, FLSA Collective Plaintiffs and Class Members were non-exempt.

**Paris's Injury, Defendants' Retaliation, and Unlawful Termination**

54. On January 24, 2025, Paris was performing her assigned duties conducting cottage dorm visits at JCCA's residential treatment campus. Upon her arrival at the designated cottage dorm, a youth counselor informed Paris that a specific resident-patient was "dysregulated" and had been placed in isolation the previous evening after allegedly attempting to set fire to a building on campus.

55. JCCA's has a codified safety policy for dangerous youth on page 80 and 81 of their corporate handbook. Described under "One-to-One Supervision of Youth" that policy dictates that youth that pose a safety risk are required to have one-to-one supervision at all times.

56. Despite this clear and apparent danger to the safety of staff, residents, and patients, Defendants failed to adhere to its own basic safety protocols. In a gross deviation from reasonable standards of care and policy, JCCA permitted the youth to leave isolation and return to the general residential population without a safety detail, staff escort, or supervision of any kind.

57. Furthermore, JCCA failed to conduct or document any psychological or behavioral clearance to verify that the youth was no longer a threat to herself or others prior to her release.

58. As a direct result of JCCA's failure to secure a known high-risk individual, the situation escalated rapidly. While Paris was attending to administrative tasks, the unsupervised youth entered the cottage dorm, slammed the door and began screaming.

59. Paris observed the youth in a volatile and emotionally heightened state. At this critical moment, Paris realized that she was in a potentially dangerous situation because there were no safety team members present to manage the escalating crisis.

60. The youth proceeded to rip a metal curtain rod from the wall and began striking a window. Paris retreated to a nearby room to place an emergency call for safety personnel on her remote walkie and then returned to the living area to attempt verbal de-escalation.

61. The youth began to calm down and requested to return to her room. Paris accompanied her to her room and observed the space in disarray, with the youth alleging that staff from a prior shift had ransacked her room.

62. The youth then ran back to the common living area and resumed striking the window with the metal rod.

63. During the loud commotion, a counselor entered the common area. Paris directed the counselor to place a second call to security via the cottage dorm landline.

64. That call was never made because the cottage dorm phone was not operational, leaving Paris trapped in a volatile environment with a dangerous individual and no hardline communication to summon immediate assistance.

65. Despite Paris's continued efforts to de-escalate, the youth threw the metal curtain rod at Paris, striking her left ankle. Plaintiff felt immediate, sharp pain to her inner left ankle, causing her to collapse.

66. Upon the eventual arrival of security, Plaintiff learned that JCCA was operating with only one safety team member for the entire campus. This severe understaffing forced the sole officer to respond from the opposite side of the facility, resulting in a critical delay in assistance.

67. JCCA's failure to mitigate known risks was further exposed when the single safety officer hesitated to transport the dangerous youth to an administrative building alone. This forced Paris into an impossible position, and despite suffering from an acute fracture, she was compelled to assist in the transport, as the safety officer was unable to manage the risk independently.

68. Upon arrival at the administration building, the youth exited and began banging on the building door. Due to the severe pain in her ankle, Pairs was unable to walk and remained in the vehicle.

69. After notifying her supervisor, Tricia Spence ('Spence'), Plaintiff was transported to the JCCA medical office. An initial inspection revealed visible bruising to the inner ankle, and the attending nurse directed Plaintiff to seek emergency medical attention without delay.

70. Later that evening, JCCA Leave Specialist Kyle Robotham (“Robotham”) contacted Paris to advise that her accrued sick, personal, and vacation time would be immediately allocated to cover her absence.

71. Paris attended urgent care visits every three days as instructed, relying on representations that this frequency was required by workers’ compensation protocols. She continued this regimen despite the fact that the frequent travel further aggravated her acute injury.

72. Paris began physical therapy on March 4, 2025 and on March 18, 2025, an MRI was performed. The MRI findings were severe: A three-centimeter area of marrow edema in the medial malleolus consistent with a nondisplaced trabecular fracture; partial tear of the flexor hallucis longus tendon; and partial tear of the anterior deep fibers of the deltoid ligament.

73. Due to ongoing pain, especially while driving, Paris was referred to pain management specialist Dr. Ari Lerner, continuing with physical therapy.

74. On June 30, 2025, Paris received an email from Robotham stating JCCA would hold her FSS position only until July 28, 2025, and advising that failure to return by July 29, 2025, could result in termination.

75. On July 28, 2025, Plaintiff received a cortisone injection and was cleared to return to work on August 4, 2025, but with **strict light-duty restrictions**: limited standing, limited driving, limited lifting, and no ladder use.

76. On July 29, 2025, Plaintiff spoke with Human Resource representative Yvette Pinkney ("Pinkney") regarding her status. Plaintiff advised she remained in pain. Pinkney informed her that a CP position might be a fit and gave a verbal overview of salary parity.

77. However, the CP job description sent to Paris that evening explicitly required the following duties that violated her medical restrictions:

a. Ability to travel to multiple work sites via public transportation;

b. Ability to stand or walk long distances; and

c. Ability to travel to multiple work sites in NYC boroughs & Westchester.

78. Defendants assured Paris that there would be exceptions made for her but refused to put accommodations for these duties in writing. Furthermore, Defendants sought to pay Paris at the lower FSS rate for the higher-level CP role.

79. By obstructing the interactive process and withholding written assurances of safety, Defendant rendered Plaintiff's working conditions untenable. These actions constitute undeniable proof of JCCA's retaliatory intent

80. On January 8, 2026, Spokowski formally terminated Plaintiff's employment, finalizing their retaliatory course of action.

81. Ultimately, conservative treatment failed to rehabilitate Paris.

82. On January 13, 2026, podiatrist Dr. Gianni Persich performed surgery on Plaintiff's left ankle, including arthroscopy and tendon/ligament repair.

83. Plaintiff retained TA Legal Group PLLC as counsel to represent Plaintiffs and FLSA Collective Plaintiffs in this litigation and agreed to pay the firm a reasonable fee for its

services. Plaintiff reserves her right to amend this complaint and file a complaint with the Equal Employment Opportunity Commission at a later date.

## CAUSES OF ACTION

### COUNT I – COLLECTIVE-WIDE VIOLATION OF THE FLSA
### (Defendants Failed to Properly Pay Plaintiff and FLSA Collective Plaintiffs Earned Overtime)

84. Plaintiff realleges and incorporates by reference all preceding paragraphs.

85. Defendants violated the FLSA, 29 U.S.C. §§ 201, *et seq.*, by failing to pay Plaintiff and the FLSA Collective Plaintiffs overtime compensation at a rate of one and one-half times their regular rate of pay for all hours worked in excess of forty (40) per workweek.

86. Defendants implemented a policy and practice of requiring employees to perform off-the-clock work before and after their scheduled shifts and during unpaid meal breaks, resulting in Paris and other employees regularly working 45-50 hours per week without proper compensation.

87. Defendants' failure to pay overtime wages was willful. Defendants were aware of the off-the-clock work and overtime hours that Plaintiff and FLSA Collective Plaintiffs did but deliberately failed to compensate their employees accordingly.

88. JCCA engages in an enterprise whose annual volume of services or business done is not less than $500,000, the activities of which affect interstate commerce in that employees of Defendants handle goods and materials produced outside of New York that moved in interstate commerce and the Defendants, as employers of such a business, are subject to the jurisdiction of the FLSA.

89. As a result of Defendants' willful violations, Plaintiff and the FLSA Collective Plaintiffs are entitled to recover their unpaid overtime wages, an equal amount in liquidated damages, and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

**COUNT II – CLASS-WIDE VIOLATION OF THE NEW YORK LABOR LAW**
**(Unpaid Wages, Unpaid Overtime, Statutory Penalties, and Attorney's Fees and Costs On Behalf of Plaintiff and Class Members Against All Defendants)**

90. Plaintiff realleges and incorporates by reference all preceding paragraphs.

91. Defendants violated the NYLL §§ 190 *et seq.* and 650 *et seq.*, and the supporting New York State Department of Labor regulations, by failing to pay Plaintiff and Class Members for all hours worked. This includes unpaid straight-time wages for work performed during unpaid breaks and unpaid overtime wages at one and one-half times their regular rate for hours worked over forty (40) in a workweek.

92. Defendants also violated NYLL § 195.1 and § 195.3 by willfully failing to provide Plaintiff and Class Members with accurate wage notices at the time of hiring and annually thereafter, and by failing to provide accurate, itemized wage statements with each payment of wages. This failure deprived Plaintiff and the Class of the ability to verify their compensation and allowed Defendants to conceal their unlawful wage practices.

93. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the New York State legislature. Defendants' failure to provide such notices trivializes the importance of these notices in protecting Plaintiff's interest in ensuring proper pay. Despite Defendants' conduct, there is a reason why the New York legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See N.Y. Spons. Mem., 2010 S.B. 8380.*

94. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the New York State legislature. Defendants' failure to provide such notices trivializes the importance of these notices in protecting Plaintiff's interest in ensuring proper pay. Despite Defendants' conduct, there is a reason why the New York legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See N.Y. Spons. Mem., 2010 S.B. 8380.*

95. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being properly paid.

96. Here, JCCA's failure goes beyond generating a risk of harm to Plaintiff and actually harmed Plaintiff. JCCA's failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates, effectively deprived employees of the ability to contest the pay provided by Defendants. This allowed Defendants to hide their wrong-doing, and continue the illegal practice of forcing employees to work overtime without compensation. This necessitated the current litigation to vindicate Plaintiff and Class Members' rights.

97. Pursuant to NYLL §§ 198 and 663, JCCA's violations were willful, entitling Plaintiff and the Class Members to recover their unpaid wages, liquidated damages equal to 100% of the underpayment, statutory penalties of $250 per workday up to $5,000 for the wage notice and statement violations, pre-judgment interest, and reasonable attorneys' fees and costs.

**COUNT III – DISCRIMINATION AND FAILURE TO ACCOMMODATE UNDER THE 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(5)(A)**
**(Defendants Discriminated Against Plaintiff and Failed to Participate in the Interactive Process and Provide Reasonable Accomodations)**

98. Plaintiff realleges and incorporates by reference all preceding paragraphs.

99. Under the ADA, an employer must provide reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A). This duty requires the employer to engage in a "good faith interactive process" to identify potential accommodations. *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218 (2d Cir. 2001).

100. JCCA failed to participate in this interactive process in good faith. Instead of a meaningful dialogue, Defendants presented Paris with a *take it or leave it* ultimatum to accept a position that was facially incompatible with her medical restrictions or face termination. *See Phillips v. City of New York*, 66 A.D.3d 170, 176 (1st Dep't 2009) (holding that an employer obstructs the interactive process when it fails to adequately respond to an employee's request for accommodation).

101. Specifically, on July 28, 2025, Plaintiff was medically cleared for light duty with strict prohibitions on driving, prolonged standing, and ladder use. Despite these known restrictions, Defendant offered Plaintiff a “Case Planner” position, the official job description of which explicitly required significant driving, transportation, and standing.

102. When Paris raised this direct conflict, Defendants’ agents verbally downplayed the requirements, telling her to essentially ignore the official job description and promising to "work around" the driving component. However, JCCA refused to memorialize these critical accommodations in writing or provide an updated job description reflecting the waiver of these essential functions.

103. An employer's refusal to confirm accommodations in writing, while simultaneously demanding an employee accept a job description that disqualifies them, constitutes a constructive denial of accommodation. By leaving Paris exposed to future discipline for "inability to perform duties" based on the unaltered job description, JCCA rendered the proposed accommodation unreasonable and illusory. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) (noting that the interactive process breaks down when an employer acts to obstruct the process).

104. Furthermore, JCCA's offer was discriminatory in its terms. While acknowledging that the CP role was a higher-level position than Paris's previous FSS role, JCCA insisted that Paris be compensated at her lower FSS pay rate.

105. A transfer to a vacant position is a reasonable accommodation, but compelling a disabled employee to accept a higher-level position at a suppressed salary effectively penalizes the employee for their disability. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999) (holding that an employer does not fulfill its obligation to accommodate if it offers a position that involves a significant diminution in salary or benefits when a comparable position is available). JCCA's attempt to obtain higher-level labor at a discount, solely because Paris was disabled and vulnerable to termination threats, violates the core anti-discrimination mandates of the ADA.

106. As a result of Defendants actions, Plaintiff is entitled to recover compensatory damages for emotional pain, suffering, inconvenience, mental anguish, punitive damages, front pay, and reasonable attorneys' fees and costs.

**COUNT IV – RETALIATION IN VIOLATION OF 42 U.S.C. § 12203**
**(Retaliation On Behalf of Plaintiff Individually Against All Defendants)**

107. Plaintiff realleges and incorporates by reference all preceding paragraphs.

108. The ADA prohibits retaliation against any individual because such individual has opposed any act or practice made unlawful by the ADA or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA 42 U.S.C. § 12203(a).

109. To establish a prima facie case of retaliation under the ADA, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

110. Plaintiff engaged in protected activity within the meaning of the ADA on multiple occasions. This included her formal requests for reasonable medical accommodations regarding her driving and standing restrictions on July 29, 2025 , and her good-faith opposition to Defendant's attempt to force her into the "Case Planner" role which facially violated those medical restrictions. Requesting a reasonable accommodation for a disability constitutes protected activity under the ADA. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002).

111. In response to Plaintiff's protected requests and opposition, Defendant subjected her to a series of materially adverse employment actions designed to punish her and deter further requests. These actions included:

a. **Threats of Termination:** On June 30, 2025, Defendant's agent Kyle Robotham issued a *take it or leave it* ultimatum, stating that Plaintiff would be terminated if she did not return by July 29, 2025, despite her ongoing medical recovery.

b. **Deprivation of Benefits:** Defendant wiped clean Plaintiff's accrued sick and vacation time, reneging on prior representations that this time would be restored upon her return.

c. **Discriminatory Pay Scheme:** Defendants attempted to coerce Paris into the "Case Planner" role, a position with higher responsibilities than her previous FSS title, while explicitly refusing to pay her the commensurate CP salary, insisting instead on the lower FSS rate.

d. **Termination:** Ultimately, JCCA formally terminated Plaintiff's employment on January 8, 2026.

112. A clear causal connection exists between Plaintiff's protected activity and the adverse actions taken against her. The temporal proximity is acute, as Defendant's threats of termination and the imposition of a discriminatory pay scheme followed in immediate succession to Plaintiff's medical leave and requests for accommodation, establishing a strong inference of retaliatory intent. *See Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (holding that close temporal proximity between the protected action and the adverse employment decision is sufficient to establish a causal connection).

113. Defendants' stated reasons for its actions, specifically the alleged inability to accommodate Plaintiff's driving restriction, were pretextual. JCCA admitted it could work around the driving requirement verbally but refused to document it, using the restriction as a weapon to force Plaintiff out of her employment or into a lower-paying tier.

114. Plaintiff suffered significant damages and is entitled to compensatory and punitive damages, back pay, front pay, and reasonable attorneys' fees and costs.

**COUNT V - VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW**
**(Defendants Discriminated, Retaliated, and Terminated Plaintiff)**

115. Plaintiff realleges and incorporates by reference all preceding paragraphs.

116. Under the NYSHRL, N.Y. Exec. Law § 296(7), it is an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article.

117. To establish a prima facie case of retaliation under the NYSHRL, a plaintiff must show that: (1) she has engaged in protected activity; (2) her employer was aware that she participated in such activity; (3) she suffered an adverse employment action based upon her activity; and (4) there is a causal connection between the protected activity and the adverse action. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 313 (2004).

118. Paris engaged in protected activity by requesting reasonable accommodations for her disability on multiple occasions, including her July 29, 2025 conversation with Human Resources regarding her driving and standing restrictions, and her subsequent refusal to accept a position that facially violated those medical restrictions without written protection. Recent amendments to the NYSHRL have explicitly codified that requesting a reasonable accommodation constitutes protected activity. *See* N.Y. Exec. Law § 296(1)(e).

119. Defendants took decisive, materially adverse actions against Paris. Under the NYSHRL, an action is adverse if it prejudices the employee's ability to perform their job or alters the terms and conditions of employment. *See La Marca v. Great Atl. & Pac. Tea Co.*, 16 Misc. 3d 1115(A) (Sup. Ct. N.Y. Cnty. 2007). Defendant's adverse actions include:

a. **The "Wiping" of Accrued Leave:** On January 24, 2025, Defendant's agent Pinkeny immediately moved to deplete Plaintiff's accrued sick and vacation time,

contrary to standard policy, penalizing her for a workplace injury caused by JCCA's own negligence.

b. **Discriminatory Pay Offer:** Defendants attempted to force Paris into the "Case Planner" role, a higher-level position with greater liability, while strictly refusing to pay the commensurate salary, instead locking her into the lower FSS rate. This created a *constructive demotion* in pay equity.

c. **Termination:** Defendant formally terminated Plaintiff on January 8, 2026. This termination occurred just five days before her scheduled surgery on January 13, 2026, a procedure necessitated by the workplace injury.

120. A causal connection is established through the acute temporal proximity between Plaintiff's assertions of her rights and Defendant's punitive responses.

121. JCCA issued the termination threat email on June 30, 2025, immediately preceding the expiration of her initial leave window.

122. Most egregiously, JCCA terminated Paris on January 8, 2026, mere days before she was scheduled to undergo major surgery (arthroscopy and tendon repair) on January 13, 2026. This timing gives rise to an inference of retaliatory intent to cut ties before Plaintiff entered a period of significant medical need and recovery. *See Krebaum v. Capital One, N.A.*, 138 A.D.3d 521 (1st Dep't 2016) (temporal proximity between protected activity and adverse action supports inference of retaliation).

123. As a result of this discriminatory conduct, Plaintiff is entitled to recover all available damages, including back pay, front pay, compensatory damages for mental and emotional distress, punitive damages, and reasonable attorneys' fees and costs.

**COUNT VI - WORKPLACE NEGLIGENCE**

**(Defendants Failed to Provide and Adhere to Reasonable Safety Protocols Which Resulted in Plaintiff's Injury)**

124. Plaintiff realleges and incorporates by reference all preceding paragraphs.

125. Under New York Labor Law § 200, Defendant JCCA owed Plaintiff a non-delegable duty to provide a "reasonable and adequate protection to the lives, health and safety of all persons employed therein." This statutory mandate codifies the common law duty of an employer to provide a safe place to work. *See Jock v. Fien*, 80 N.Y.2d 965, 967 (1992).

126. Plaintiff acknowledges that the New York Workers' Compensation Law is generally the exclusive remedy for workplace injuries. However, an exception exists where the employer's conduct is so egregious that it amounts to an intentional tort or gross negligence that creates a "substantial certainty" of injury. *See Blanco v. American Tel. & Tel. Co.*, 90 N.Y.2d 757 (1997); *Acevedo v. Consolidated Edison Co. of N.Y.*, 189 A.D.2d 497 (1st Dep't 1993).

127. Defendant's conduct in this matter transcended mere negligence and constituted gross negligence and a reckless disregard for human safety. By knowingly creating a specific, dangerous condition and stripping Plaintiff of the means to protect herself, Defendant engaged in conduct where injury was substantially certain to occur.

128. Defendants' systemic failures not only breached state law but constituted a blatant violation of the Occupational Safety and Health Act's ("OSH Act") General Duty Clause, 29 U.S.C. § 654(a)(1). This federal mandate requires employers to furnish a workplace entirely free from recognized hazards that are causing or are likely to cause death or serious physical harm.

129. The Occupational Safety and Health Administration (OSHA) explicitly identifies patient violence in residential facilities as a severe workplace hazard. *Sec'y of Labor v. Integra Health Mgmt., Inc.*, 2019 WL 1142920, OSHRC Docket No. 13-1124 (OSHRC Mar. 4,

2019)(holding that the risk of employees being physically assaulted by clients with a history of violent behavior is absolutely a "recognized hazard" under the General Duty Clause).

130. Specifically, Defendant breached its state and federal duty through the following systemic failures:

a. **Reckless Reintroduction of a Known Danger:** Defendant was explicitly aware that the specific youth involved was "dysregulated" and had attempted to commit arson (setting the cottage on fire) less than 24 hours prior. Despite this known, lethal propensity, Defendant deliberately returned the youth to the residential cottage without a safety escort, without a psychological evaluation, and without a behavioral clearance.

b. **Abandonment of Staff (Staffing Failure):** Defendant knowingly operated a high-risk residential treatment campus with **only one safety officer** on duty for the entire facility. This intentional understaffing rendered the safety team functionally useless, as evidenced by the officer being located on the opposite side of the campus during the emergency, resulting in a critical response delay.

c. **Failure of Critical Safety Infrastructure:** Defendant failed to maintain the most basic safety lifeline: the cottage landline phone. When the youth began her assault, Plaintiff attempted to summon help via the cottage phone, only to find it non-operational. Defendant's failure to maintain communication equipment in a facility housing violent youths constitutes a gross deviation from the standard of care.

d. **Failure to Follow Codified Safety Protocol**: JCCA's handbook clearly states that youth identified as potential safety risks are expected to be supervised in a one-to-one setting. This particular youth had indisputably shown herself to be a

significant safety risk by attempting to set fire to an occupied building the night before. It is inexplicable that JCCA failed to assign safety personnel to this individual. The fact that JCCA only had one safety officer working the entire campus makes matters even worse.

131. It was not merely possible, but reasonably foreseeable and substantially certain, that placing an unescorted, dysregulated youth with a history of violence and arson into a cottage with no security presence and no working phone would result in physical assault and injury to the lone staff member present. *See In re World Trade Ctr. Bombing Litig.*, 17 N.Y.3d 428 (2011) (holding that a landowner has a duty to implement reasonable security measures to protect against foreseeable third-party criminal acts).

132. As a direct and proximate result of Defendants' gross negligence and intentional creation of a hazardous workplace, Plaintiff was trapped in the cottage without support or communication, leading to her being struck by the metal curtain rod and sustaining severe, permanent injuries to her left ankle (nondisplaced trabecular fracture, tear of the flexor hallucis longus tendon, and tear of the deltoid ligament).

133. As a result of Defendants' gross negligence and disregard for its own safety policy, Plaintiff is entitled to recover damages for physical pain and suffering for the acute trauma of the fracture and ligament tear, permanent physical impairment for long-term loss of range of motion, chronic pain, and physical limitations, emotional distress, loss of enjoyment of life, economic loss, punitive damages, and reasonable attorneys' fees and costs.

**COUNT VII - DISCRIMINATION AND FAILURE TO ACCOMMODATE UNDER 29 U.S.C. § 794 THE REHABILITATION ACT, SECTION 504**
**(Defendants Discriminated Against Plaintiff for a Disability and Failed to Reasonably Accommodate**

134. Plaintiff realleges and incorporates by reference all preceding paragraphs.

135. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by any program or activity receiving federal financial assistance. Upon information and belief, Defendant JCCA, as a provider of foster care and residential treatment services, receives federal financial assistance, rendering it a covered entity subject to the mandates of Section 504.

136. Defendant violated Section 504 by failing to provide reasonable accommodations for Plaintiff's known physical disabilities and by acting in bad faith during the interactive process.

137. The Second Circuit establishes that claims for employment discrimination and failure to accommodate under the Rehabilitation Act must be evaluated under a strict "but-for" causation standard. *See Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019). Here, *but for* Plaintiff's disability Defendant would not have subjected her to the impossible ultimatum of accepting a Case Planner role that facially contradicted her medical restrictions without providing any written assurance or protection.

138. Moreover, Defendants' conduct constitutes a flagrant campaign of unlawful retaliation in direct violation of the Rehabilitation Act. Upon Plaintiff's engagement in statutorily protected activity, specifically, requesting reasonable medical accommodations and opposing facially unsafe job requirements, Defendant responded with swift and aggressive retaliatory animus.

139. Rather than fulfilling its obligation to accommodate, Defendants subjected Plaintiff to a series of materially adverse employment actions. These punitive measures included issuing coercive threats of termination, unlawfully depleting her accrued leave time, and attempting to impose a discriminatory compensation scheme that demanded higher-level Case Planner duties at a suppressed, lower-tier FSS pay rate. This systematic retaliation ultimately culminated in

Plaintiff's formal, wrongful termination on January 8, 2026, effectuating Defendant's clear intent to penalize her for exercising her federally protected rights. *See Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 83 (2d Cir. 2020) (affirming the viability of retaliation claims under Section 504 where materially adverse actions are causally linked to protected activity)

140. As a result of Defendant's intentional and willful violations of the Rehabilitation Act, Plaintiff has suffered substantial harm. Accordingly, Plaintiff is entitled to compensatory damages for emotional distress, pain and suffering, and loss of enjoyment of life, back pay, front pay, lost benefits and reasonable attorneys' fees and costs.

## COUNT VIII - NEW YORK NOT-FOR-PROFIT CORPORATION LAW § 715-b (Whistleblower Retaliation)

141. Plaintiff realleges and incorporates by reference all preceding paragraphs.

142. Defendant JCCA is a New York non-profit corporation with twenty or more employees and annual revenue in excess of $1,000,000, thereby subjecting it to the strict statutory mandates of N-PCL § 715-b. Under this statute, Defendant is legally required to implement, maintain, and actively enforce a whistleblower policy that affirmatively protects employees from retaliation when they report in good faith any suspected illegal conduct, unsafe practices, or violations of adopted corporate policies.

143. Plaintiff engaged in statutorily protected whistleblower activity by repeatedly reporting, opposing, and complaining to JCCA management regarding the facility's severe security understaffing and the failure to maintain operational emergency communication lines in the residential cottages. These internal complaints explicitly highlighted systemic operational failures that violated established state workplace safety mandates, including NYLL § 200, and created an imminent, recognized hazard to the lives and physical safety of both the staff and the

vulnerable youth population. Plaintiff's disclosures constituted precisely the type of good-faith reporting of corporate and legal violations that N-PCL § 715-b is designed to encourage and protect.

144. In direct response to Plaintiff's protected disclosures regarding these severe safety and compliance failures, Defendant initiated a campaign of unlawful retaliation. Rather than investigating the reported hazards or remediating the dangerous conditions, Defendant actively weaponized Plaintiff's employment status against her. This retaliatory animus culminated in Plaintiff's wrongful termination on January 8, 2026. This punitive discharge explicitly violates the core mandate of N-PCL § 715-b, which categorically prohibits adverse employment actions, including termination, against an employee acting as a whistleblower.

145. New York firmly establishes that N-PCL § 715-b creates an implied private right of action, empowering aggrieved employees to directly sue non-profit employers for whistleblower retaliation. *See Ferris v. Lustgarten Found.,* 189 A.D.3d 1002, 1005 (2d Dep't 2020) (holding that a private right of action under Labor Law § 715-b is necessary to effectuate the Legislature's intent to protect whistleblowers from employer retaliation).

146. Federal courts applying New York law have consistently affirmed this precedent, holding non-profit entities strictly accountable when they penalize staff for raising compliance concerns. *See Maron v. Legal Aid Soc'y,* 605 F. Supp. 3d 547, 566 (S.D.N.Y. 2022) (recognizing that N-PCL § 715-b supports an implied private right of action for retaliation). Defendant's retaliatory termination of Plaintiff clearly constitutes actionable conduct.

147. Plaintiff is therefore entitled to comprehensive relief to make her whole, including but not limited to back pay, front pay, compensatory damages for severe emotional distress and reputational harm, and the recovery of reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, the FLSA Collective Plaintiffs, and the Class Members, respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

- A declaratory judgment that the practices complained of herein are unlawful under the FLSA, NYLL, ADA, 42 U.S.C. § 12112, N-PCL § 715-b, 29 U.S.C. § 794, The Rehabilitation Act, Section 504, and the NYSHRL;

- An injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, permanently restraining them from engaging in the unlawful practices, policies, and patterns set forth herein;

- Certification of this action as a collective action under the NYLL and as a class action under Federal Rule of Civil Procedure 23;

- Designation of Plaintiff as the representative of statewide FLSA Collective and the Rule 23 Class and her counsel as Class Counsel.

- An award of unpaid overtime wages under the FLSA and NYLL, and unpaid straight-time wages under the NYLL;

- An award of liquidated damages equal to 100% of the unpaid wages under both the FLSA and the NYLL;

- An award of statutory penalties under NYLL §§ 198(1-b) and 198(1-d) for Defendants' failure to provide compliant wage notices and wage statements;

- An award of compensatory damages, including back pay and front pay, for Defendants' unlawful discrimination and retaliation under the FLSA § 215(a)(3), 42 U.S.C. § 1981a, 42 U.S.C. § 12112(a), 29 U.S.C. § 794a(b), N-PCL § 715-b, and the NYSHRL;

- An award of damages for emotional distress, mental anguish, and humiliation;

- An award of punitive damages for Defendants' willful, malicious, and reckless conduct;

- An award of pre-judgment and post-judgment interest at the applicable legal rate;

- An award of reasonable attorneys' fees, costs, and expenses incurred in this action; and

- Such other and further legal or equitable relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: Huntington, NY
April 1, 2026

**TA LEGAL GROUP PLLC**
*Attorneys for Plaintiff Paris,*
*FLSA Collective Plaintiffs and Class Members*

By: ______________________________
Taimur Alamgir, Esq.
Matthew J. Daidola, Esq.
205 East Main Street, Suite 3-2
Huntington, NY 11743
(914) 552-2669
(631) 942-7399
tim@talegalgroup.com
matthew@talegalgroup.com